RAINIER, Inc.
v.
The UNITED STATES.
No. 49390.

United States Court of Claims.
Jan. 16, 1957.

Alexander Boskoff, Washington, D. C., for plaintiff.

William A. Stern, II, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Geu., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

The plaintiff sues for $338,371.88, which it claims is the balance due it on 90,050 overcoats which it manufactured for the Army under a contract originally entered into on or about September 16, 1946, and dated June 28, 1946. Plaintiff's contract was one of 18 awarded about that time for the manufacture of 1,262,000 field overcoats for the Army for a consideration of approximately $22,647,650.

The facts, which are extensive and somewhat complicated, are set forth in detail in the court's findings of fact.

On June 14, 1946, invitations to bid were sent out to 150 clothing manufacturers by the Quartermaster Purchasing Office at New York, hereinafter called the New York Office, but there was such a strong civilian demand in the clothing market at that time that only 18 bids were received. The request for bids recited that the informal bids would be used as a basis for negotiating contracts.

After considerable discussion as to the inclusion of a price revision clause, the plaintiff submitted a unit price bid of $19.09 per garment.

Telegraphic notices of conditional awards were sent to the 18 bidders, including plaintiff, on June 29, 1946, just prior to the end of the fiscal year. By telegram, dated August 9, 1946, plaintiff was advised by the contracting officer that the award of the contract for the manufacture of 90,000 overcoats had been confirmed by the War Department.

After the overcoat contracts had been executed, the Quartermaster General criticized the New York Office for its failure to make a cost analysis of the bids

before the awards were made, called attention to the high administrative expense and high rate of profit in plaintiff's contract, and returned the file relating to all of the overcoat contracts, except three, to the New York Office with the suggestion that a renegotiation with some of the contractors as to the unit prices specified in their contract would probably be necessary.

Negotiations for a reduction in the unit bid prices were conducted during the period November 1 to November 15, 1946, under the supervision of Major Voiers who was then Director of Procurement of the New York Office and who became successor contracting officer on or about December 1, 1946. Plaintiff's representatives were called upon to attend two meetings held in the New York Office. At the first meeting plaintiff's officers refused to agree to any adjustment in the bid price, but a few days later they signed Modification "C" of the contract, whereby plaintiff's unit price was reduced from $19.09 to $18.99. Major Voiers reported the reduction in plaintiff's unit price to the Quartermaster General with the statement that all elements of cost included in plaintiff's bid had been refigured and substantiated.

On May 19, 1947, Major Voiers notified plaintiff that almost 30 percent of the overcoats had been delivered, and called attention to a provision in the price revision article which required the contractor to submit cost data within five days after such delivery. Cost data were submitted by plaintiff and a field audit was recommended by defendant's Cost and Price Analysis Section. But in the meantime effort was made to get the profit items reduced.

A price Adjustment Review Board, composed of various officials of defendant's New York Office, met to consider the matter of negotiating a revision of the profit items of the contract. No decision on that question was made, but the Board voted that the field audit be made.

On July 28, 1947, the Price Adjustment Advisory Group met to consider what amount should be withheld from payments on plaintiff's delivery, pending the completion of the field audit. After discussion the members voted to withhold $3.06 per unit from plaintiff and to proceed with the field audit.

On July 29, 1947, the contracting officer notified plaintiff that $3.06 per unit would be withheld as a temporary expedient, pending the result of the field audit. Plaintiff protested this action and after it agreed to furnish a bond all but $50,-000 of the funds withheld were released to it.

On October 16, 1947, after the Army Audit Agency had submitted its report, Major Voiers, the contracting officer, telephoned the plaintiff's president and demanded that he appear at once at the former's office to negotiate a revised price. Plaintiff's president, Oberman, stated that he was unable to appear immediately because one of plaintiff's officers was in the hospital and he himself was needed at the factory. He suggested a meeting be set for Monday, October 20, 1947. This was refused. Major Voiers insisted that he come at once and when Oberman declined, the contracting officer declared that he would then and there negotiate by telephone, and he proceeded to read off proposed unit prices in the various cost classifications.

Mr. Oberman objected to this procedure, whereupon Major Voiers stated that he would issue a unilateral determination of a unit price of about $15 per unit and that the fiscal officer would be instructed to adjust payments accordingly.

Plaintiff filed a telephone protest in Washington, and, as a result, the contracting officer agreed to a meeting with plaintiff on October 20, 1947. However, at that meeting at which plaintiff's officers appeared with their accountants, Major Voiers refused to go into the cost items and insisted that he was interested only in reducing the profits. He refused to furnish plaintiff's representatives a copy of the Army Audit Agency's report or any other cost data on which he re-

lied. He did mention the revised cost figures that had been submitted to him by the Cost and Price Analysis Section. The conference lasted about 20 minutes. The two sets of cost data which plaintiff had previously submitted were not used as a basis for negotiation. Plaintiff's representatives had no opportunity to determine which of plaintiff's claims had been deleted, and they were given no information as to how the unit cost figure supplied by the Cost and Price Analysis Section was computed.

The conference of October 20th was the first and only one afforded plaintiff by the contracting officer for negotiating a revision of price. As to this conference, our trial commissioner who heard the testimony recommended the following finding:

"The evidence establishes that the contracting officer had made a determination of the unit price he intended to allow before the conference began, that he did not negotiate with plaintiff in accordance with the terms and provisions of the price revision article, and that he acted arbitrarily in making his determination."

■■ We approve the finding, since we have seldom had our attention called to a more arbitrary attitude on the part of a constituted official. Certainly, when the testimony is read, there appears to have been a complete failure on the part of the contracting officer to negotiate in good faith as required by section 14(d) of the contract, which is set out in the court's finding 3.

In fact, defendant's counsel does not strongly contend that there was negotiation in good faith by the contracting officer and his associates. But he earnestly contends that regardless of the circumstances plaintiff is entitled only to its costs plus a profit of $1.65 per unit.

The plaintiff, on the other hand, contends that it should recover on the basis of a unit price of $18.99 as provided in the first modification agreement.

We cannot accept either of these figures. Since the good faith negotiations required by the contract never occurred, the court must determine from all of the evidence the unit price to which the plaintiff is entitled.

The record contains 1132 pages of testimony and numerous exhibits. The experienced trial commissioner, who personally heard the witnesses, has found that in all the circumstances the plaintiff is entitled to a unit price of $17.2915. Included in this figure is a profit allowance of $3.06 per unit which the commissioner has found to be fair and reasonable in the light of all the evidence. The detailed reasons for the commissioner's conclusions as to the unit price are set out in the court's findings 38 to 52, inclusive.

■ After a thorough review of the record we conclude that the findings of fact made by the commissioner are fully supported by the evidence, and the court, in its ultimate findings, has adopted the facts and conclusions of the commissioner. Plaintiff is entitled to recover the sum of $185,421.95, and judgment will be entered for that amount.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff is a New York corporation which, at all times material to this action, was engaged in the manufacture of wearing apparel. Prior to the execution of the contract involved here, plaintiff was designing and manufacturing sportswear and ski-wear. It had its principal office and show room at 1410 Broadway, New York City, and it had leased a loft at 777 Flushing Avenue, Brooklyn, New York, where machinery and equipment had been installed for manufacturing purposes.

Plaintiff was incorporated in March of 1946 with a paid-in capital of $80,000. Its capital stock was owned in equal shares by the following individuals who actively participated in the business and served as its officers:

Hyman M. Oberman, *President*.
Herman O. Karp, *Vice President*.
Joseph Bell, *Treasurer*.
Abraham Smith, *Secretary*.

2. In April of 1946, the four individuals who owned the stock of plaintiff organized a second New York corporation under the name of A. & L. Smith Garment Co., Inc., hereinafter referred to as the Smith Co. Its paid-in capital was $10,000 and its stock was owned equally by the four individuals who owned the stock of plaintiff. They actively participated in the business of the Smith Co. and held offices in that company as follows:

Abraham Smith, *President*.
Herman Karp, *Vice President*.
Hyman Oberman, *Treasurer*.
Joseph Bell, *Secretary*.

Soon after it was organized, the Smith Co. engaged in business as a sewing contractor for clothing manufacturers. The Smith Co. leased plaintiff's Brooklyn plant and its machinery for operations, and used the plant while plaintiff was still in process of developing its sample lines. All four stockholders and officials of the Smith Co. had had considerable experience in the manufacture of clothing and devoted their full time to its activities and to that of the plaintiff.

3. On or about September 16, 1946, plaintiff and the defendant, acting through the Quartermaster Corps, War Department, entered into a written contract dated June 28, 1946, whereby plaintiff agreed to manufacture and deliver 90,000 field overcoats with removable liner at a unit price of $19.09, or for a total consideration of $1,718,100. Under the terms of the contract, the Government furnished the cloth and liner materials, but the contractor was required to furnish the trimmings, buttons, thread, labels, etc., which are generally referred to as trimmings and findings.

The contract contained the following provisions:

* * * Article 10. Payments.—Upon the submission of properly certified invoices or vouchers, the contractor shall be paid the prices stipulated herein for supplies delivered and accepted or services rendered, less deductions, if any, as herein provided. Unless otherwise specified, payment will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or when requested by the contractor, payments for accepted partial deliveries shall be made whenever such payments would equal or exceed either $1,000 or 50% of the total amount of the contract.

* * * * * *

"Article 16. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall mail to the Contractor a written notification of his determination. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision shall be final and conclusive upon the parties. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract. * * *"

The contract stated that certain supplementary contract provisions entitled "Revision of Price" were incorporated in and made a part of the contract, except that the percentage mentioned therein was changed from 40 percent to 30 percent. The "Revision of Price" article, so incorporated in the contract, read as follows:

"14. Revision of Price:

"(a) The prices fixed herein may be increased or decreased in accordance with this Article.

"(b) *Times for negotiation.*—(1) Upon completion of delivery of forty percent (40%) of the items to be furnished under this contract, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within 5 days after the completion of delivery of said forty percent (40%) the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this Article. At any time and from time to time after the completion of delivery of said forty percent (40%), subject to the limitations specified in this Article, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to adjust the prices under this contract. No demand shall be made prior to 90 days after the completion of delivery of said forty percent (40%) and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand, provided, however, that this limitation shall not be applicable in the event that during any 90-day period the War Labor Board or any similar Government agency shall authorize or order a change in wages, salaries or conditions of employment in the plants of the Contractor used in the performance of this contract. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as 'the effective date of the price revision'. For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price revision. Any demand under this Article, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this Article. If the demand is made by the Government, such statements and data will be furnished by the Contractor within 30 days of the delivery of the demand.

"(2) In the event all remaining work under this contract, as it may from time to time be amended, shall be terminated under Article entitled 'Termination at the Option of the Government' no demand shall then or thereafter be made and any demand the effective date of which is less than 30 days before the effective date of such termination shall be void and of no effect.

"(c) *Submission of data.*—At the time or each of the times specified or provided for in paragraph (b) of this Article the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the effective date of the price revision, itemized so far as is practicable in the manner prescribed by War Department Standard Procurement Form No. 3; (ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new contract. The Government may make such examination of the Contractor's accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.

"(d) *Negotiations.*—(1) Upon the filing of the statements and data required by paragraph (c) of this Article, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price revision. Negotiations for price revisions under this Article shall be conducted on the same basis, employ-

ing the same types of data (including, without limitation, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new War Department contract.

"(2) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision (or such other later date as the parties may fix in such supplemental agreement).

"(e) *Disagreements.*—If within 30 days after the date on which the statements and data are required pursuant to paragraph (b) of this Article to be filed (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to revised prices, the failure to agree shall be deemed to be a disagreement as to a question of fact which shall be disposed of in accordance with Article entitled 'Disputes', and the prices so fixed shall remain in effect for the balance of the contract notwithstanding any other provision of this Article.

"(f) *Payments.*—Until new prices shall become effective in accordance with this Article, the prices in force at the effective date of the price revision shall be paid upon all deliveries, subject to appropriate later revision made pursuant to paragraph (d) or (e) or (h) (2) (B) of this Article.

"(g) *Termination provisions.*—For any of the purposes of Article entitled 'Termination at the Option of the Government' of this contract (including, without limitation, the computation of 'the total contract price' and 'the contract price of work not terminated'), the contract price of delivered articles shall be deemed to be,

"(1) for all items delivered prior to the effective date of the price revision, the contract price (giving effect to any prior revisions under this Article) applicable to each such item;

"(2) for all items delivered on or after the effective date of the price revision,

"(A) the contract price as revised in accordance with this Article if such revision shall have been agreed upon; and

"(B) if such revision shall not have been agreed upon, then such estimated prices as the Contractor and the Contracting Officer may agree upon as reasonable under all the circumstances and in the absence of such agreement such reasonable prices as may be determined in accordance with Article entitled 'Disputes'.

"(h) *Termination during the initial period.*—In the event that this contract is terminated under Article entitled 'Termination at the Option of the Government' or the Contractor's right to deliver is terminated under Article entitled 'Delays-Damages', so that the last delivery under the contract as terminated is made prior to the completion of the initial period as specified in paragraph (b) of this Article, the Contractor within 15 days after such last delivery shall furnish the data required by paragraph (c) of this Article and thereupon the parties shall negotiate in good faith to agree upon revised prices under this contract. The agreement reached shall be evidenced by a supplemental agreement to this contract stating the revised prices under the contract. Any disagreement as to the revised prices will be disposed of as a question of fact in accordance with Article entitled 'Disputes'."

4. Plaintiff's contract was one of 18 awarded for the manufacture of 1,262,000 field overcoats for the Army at a total cost of approximately $22,647,650.

On June 14, 1946, the Quartermaster Purchasing Office at New York, hereinafter called the New York Office, issued invitations for bids to 150 clothing manufacturers. The invitation was designated "Request for Informal Bid" and stated that the informal bids received in response to the invitation would be used as a basis for negotiating contracts.

Only 18 bids were received, because the clothing market was then dominated by a strong civilian demand which continued throughout 1947, and most manufactur-

ers were unwilling to devote their facilities to production of clothing for the Army. The bid prices ranged from $14.25 to $22.75 per unit on quantities offered for delivery. Under the circumstances then existing in the clothing market, the contracting officer considered that the prices were reasonable and awards were made at the unit price quoted in each instance.

5. The New York Office was in charge of a Commanding Officer and included a Director of Procurement, a Buying and Production Branch, a Clothing and Equipage Branch, a Cost and Price Analysis Section, and a Legal Section. The services of the Army Audit Agency for that area were also available to the New York Office.

Lt. Boyden Bearce was the contracting officer for the procurement of the field overcoats until about December 1946. In January 1947, Major Lewis Voiers became the contracting officer for the field overcoats. He was first assigned to the New York Office in May 1946, where he was placed in charge of the Buying and Production Branch covering six or seven sections of procurement, including the Clothing Section, and was the immediate superior of Lieutenant Bearce. In September 1946, Major Voiers became Director of Procurement for the entire office.

During the time that Lieutenant Bearce acted as contracting officer, Major Voiers received daily reports from and had frequent discussions with him and with other subordinates regarding prices, production progress, and other matters relating to the overcoat contracts. The proposed awards of the overcoat contracts were discussed with Major Voiers and he approved them.

6. The invitation to bid had attached thereto a form of the proposed contract containing the Revision of Price article. Beginning with the day after the invitations were issued, most of the bidders called at the New York Office for an interpretation of that article of the contract, because they had not previously encountered it in Government contracts. They were referred to the Legal Section, since neither the contracting officer nor the civilian Chief of Procurement of the Clothing Section had had any previous experience with that provision of the contract and did not understand its meaning.

After receiving the request for bids, plaintiff's officers decided to submit a bid at a unit price of $19.09 for the manufacture of the overcoats. However, the meaning and applicability of the Revision of Price article was not clear to them, and they decided to secure an interpretation of its language before submitting the bid. Accordingly, Mr. Oberman and Mr. Bell went to see the contracting officer a few days before the bids were required to be submitted and were referred to Mr. Allen, Chief of the Legal Section. They informed Mr. Allen that their experience with the renegotiation of Government contracts during the war had been unsatisfactory and that if price revision was analogous to renegotiation as applied to war contracts, they did not intend to submit a bid on the overcoats. They referred specifically to officers' salaries and profit.[1] While there is a conflict in the evidence as to the exact details of the interpretation given by Mr. Allen, it is undisputed that he ad-

---

[1]. Sec. 403 of the Sixth Supplemental National Defense Appropriation Act of 1942, 56 Stat. 245, 50 U.S.C.A.Appendix, § 1191, was known as the Renegotiation Act. In Sec. 403(b) it authorized and directed the Secretary of each Department to insert in any contract exceeding $100,000 in amount a provision for the renegotiation thereof and for the retention by the United States of any amount of the contract price which, as a result of renegotiation, was found to represent excessive profits. Sec. 403(d) of the same act provided that in renegotiating a contract price or determining excessive profits, the Secretaries of the respective Departments should not make any allowance for any salaries or other compensation paid by a contractor to its officers or employees in excess of a reasonable amount.

vised plaintiff's officers that the Renegotiation Act had expired in 1945, and therefore, that the overcoat contracts would not be subject to renegotiation as provided in that Act. Messrs. Oberman and Bell then returned to the office of the contracting officer and imparted to him the advice they had received from Mr. Allen. The contracting officer stated that he agreed with and would abide by the interpretation given by Mr. Allen.

Based on the conversations referred to above, plaintiff has contended, both in the hearings before the War Department Board of Contract Appeals and in this action, that plaintiff's officers were informed and understood that the amounts specified in plaintiff's bid for officers' salaries and profit would not be subject to reduction under the price revision article, and that the article applied only to items of cost, such as labor, which would vary in amount during the period of performance.

7. After considerable discussion in the New York Office, it was decided to delete the price revision article from the overcoat contracts, and plaintiff was advised of this decision. Acting on this information, plaintiff submitted its first bid about June 20, 1946, at a unit price of $24.95. The unit cost breakdown, required on the bid form, showed that the price bid by plaintiff included $1.70 for trimmings and findings, $1.40 for general and administrative expenses, $1.85 for operating profit, and $20 for subcontracted operations and assemblies to be performed by the Smith Co. at 777 Flushing Avenue, Brooklyn, New York.

8. After plaintiff's proposal had been submitted, defendant advised the bidders that a provision for revision of prices would be included in the contracts. Thereupon, plaintiff submitted an amended bid by letter of June 24, 1946, which read as follows:

"This will confirm our telegram dated June 22, 1946 advising you of our intention to submit an amended bid, as we were under the impression that the Price Revision clause was eliminated.

The following is our amended bid price:

| Cost Breakdown | Ranier, Inc. | A & L Smith Garment Co., Inc. |
|---|---|---|
| Trimmings and Findings.......... | $ 1.30 | |
| Subcontracted operations & Assemblies ...................... | 15.36 | $15.36 |
| Direct labor—Cutting............. | | .85 |
| Direct labor—Sewing............. | | 8.35 |
| Indirect factory expense—Ind. Labor ......................... | | 1.00 |
| Indirect factory expense—All other ............................... | | 1.10 |
| G & A Expense................... | .70 | 1.00 |
| Operating Profit (Before income and excess profits taxes). | 1.73 | 3.06 |
| Total proposed unit price........ | $19.09 | |

In view of the fact that Mr. Allen of the QM Legal Branch advised us that Supplementary Contract Provision No. 14 remains part of the bid, we have amended our bid price as stated above, based on prevailing wage rates."

9. Telegraphic notices of conditional awards were sent to the 18 bidders on Saturday, June 29, 1946, or Sunday, June 30, 1946. By telegram of June 29, 1946, plaintiff was notified by the contracting officer that its bid had been accepted for a quantity of 90,000 overcoats at a unit price of $19.09 and that the contract would include the price revision article. The notice also stated that the award was subject to an inspection of plaintiff's manufacturing facilities and was also subject to the approval of the Chief, Current Procurement Branch, Office of the Director of Service Supply and Procurement, War Department, General Staff.

10. Following the award and prior to July 15, 1946, Charles Brandt, a civilian assistant to the contracting officer, inspected the Smith Co.'s plant at 77 Flushing Avenue, which was then in full production in civilian work. Messrs. Oberman and Bell were present at the time and informed the inspector that Mr. Bell, plaintiff's production manager, was the former owner of the B. & D. Coat Co., which had manufactured a substantial quantity of similar overcoats under war contracts; that most of the employees were former employees of the B. & D.

Coat Co., and that they were experienced in making the type of overcoat described in the specifications. The space then occupied covered approximately 15,000 square feet, but the inspector was advised that 8,000 square feet of additional space had been arranged for and would be available about January 1, 1947. The information conveyed to the plant inspector was confirmed by letter from plaintiff to the contracting officer under date of July 15, 1946.

By telegram of August 9, 1946, plaintiff was advised by the contracting officer that the award of the contract for the manufacture of 90,000 overcoats had been confirmed by the War Department. Upon receipt of the telegram, plaintiff and the Smith Co. discontinued the solicitation of civilian business and began the liquidation of the civilian business previously obtained so that their entire facilities could be devoted to the performance of the contract.

11. If standard procedure in the New York Office had been followed, each of the bids for the manufacture of the overcoats would have been referred to the Cost and Price Analysis Section for an analysis by the section and a report to the contracting officer. However, no such analysis was made because of the great haste with which the New York Office acted in accepting the bids and awarding the contracts. About the end of June 1946, the contracting officer was advised that approximately $40,000,000 had been allocated for the procurement of overcoats and other clothing, exclusive of the value of materials which had been purchased and were then in storage. However, this appropriation from which the funds were allocated expired at the end of the fiscal year, and the funds had to be committed on or before June 30, 1946. Accordingly, the telegraphic awards were sent to the 18 bidders on June 29 and June 30, 1946.

12. After the execution of the contracts by plaintiff and the 17 other bidders, the New York Office requested the Quartermaster General to approve the awards, stating that no cost analysis had been made, because the overcoat was a new article for which no cost experience was available and because the contracts were subject to price revision on the basis of actual experience. In a reply memorandum of October 16, 1946, the Quartermaster General criticised the New York Office for its failure to make an analysis of the bids before awarding the contracts. The memorandum read in part as follows:

"* * * The fact that each contract contains a price revision article does not obviate the necessity for analyzing the original elements of cost submitted and establishing a close pricing pattern at the outset of contractual negotiations. In the administration of the price redetermination article a contractor is required, after completing 40 per cent of the contract, to submit a cost breakdown, based upon actual experience, following the structure of his original estimated cost breakdown. In theory the contracting officer reviews this new breakdown and compares it with the original estimate and with similar submissions by other bidders. Should such review and comparison satisfy the contracting officer he could approve the new cost breakdown and establish it as the basis for remuneration under the terms of the contract. In actual practice it is usually found necessary to dispatch an accountant to the contractor's plant to perform an audit. The official report of this audit becomes the basis for the contracting officer's final determination. In the course of negotiations arriving at this determination all of the contractor's cost elements are discussed. In those cases where the contractor's allocations of burden, general and administrative expense or profit appear unreasonably high the contracting officer will endeavor to reduce the appropriate cost to one that is reasonable. In this connection the ratios originally submitted by the contractor and allowed by the

contracting officer become a basis for contention. For example, if the contractor has contemplated a profit of 30 per cent of total costs in his original bid and the contracting officer has not contested this rate, the contractor might well assume during the price redetermination negotiations that his profit should be 30 per cent of his revised total costs."

The memorandum called specific attention to plaintiff's bid, among others, and noted the "pyramided G. & A. Expense" and the high rate of profit anticipated by both the prime contractor and the subcontractor. The memorandum directed the New York Office to make a proper analysis of the bids that had been accepted and to resubmit a request for the approval thereof.

13. Pursuant to the directive of the Washington office, Major Voiers sent that office an analysis of each of the bids and forwarded a second request for the approval of the awards. In connection with the analyses, Major Voiers also submitted a memorandum of comments dated October 25, 1946. With respect to plaintiff's bid, the comments were:

"Bid No. 8.—Rainier Inc. bid for 100,000 coats at the highest price submitted, $24.95. This would amount to $2,495,000. The sub-contract price of $20.00 to A. and L. Smith Garments contrasts with the average of $17.31. In addition, Rainier shows $1.40 for general and administrative expenses, which is above the average. At this rate, $140,000 G. & A. would be accumulated over the entire contract. Only a comparison to an overall profit and loss statement would reveal the propriety of this item. To the extent that G. & A. is over applied, additional profit will accrue. Profit at $1.40 is 8% of costs. In determining the propriety of this item it is well to consider the manufacturing effort expended. There is no indication of the financial arrangement between the prime and subcontractor. Subsequently, the contractor

filed an amended bid at $19.09, in which trimmings were reduced from $1.70 to $1.30, G. & A. from $1.40 to $.70, operating profit from $1.85 to $1.73.

"The subcontractor's price was reduced from $20.00 to $15.36. Profit for the subcontractor is shown as $3.06 or 25% on costs. Together the profits of the prime and sub are also 25%. G. & A. at $.70 for the prime and $1.00 for the sub are $.50 above the average. This is equivalent to $50,000 on the entire contract.

"The prime contractor's reduction in price may be attributed to the forward pricing program of the Government and at a reduction $5.86 per garment would amount to $586,-000 on the proposed contract. The contractor stated that the price was revised upon the learning of the inclusion of a price revision clause in the contract so that a provision for possible wage increases could be eliminated.

"*Conclusion:*

"Inasmuch as there are no yardstick costs available on this item, comparisons were limited to data furnished by the various contractors. It must be pointed out that without overall profit and loss statements it is difficult to evaluate the effect of volume upon the various overhead allocations. In instances of overabsorbtion [sic] of indirect expenses additional profits accrue.

"In instances where subcontractors perform the entire manufacturing operation it is not known if this arrangement is done because of economic necessity or for greater profit to the prime-contractor."

14. By memorandum of November 1, 1946, the Office of the Quartermaster General returned to the New York Office the complete file pertaining to the overcoat contracts, with the exception of material relating to three of the bids. The memorandum requested that additional information be submitted with respect

to the remaining 15 bids, including plaintiff's bid, and stated in part as follows:

"3. In order to satisfactorily prepare the information required attention is directed to paragraphs 2 and 3 of 3d Indorsement from this office dated 16 October 1946 and to comments in further detail contained in the Cost & Price Analysis Branch report prepared by your installation. All questionable cost comments must be satisfactorily determined before further action can be contemplated by this office. Cost information presently lacking or incomplete must be secured and appropriately considered. The nature of many of these comments is sufficiently serious to require further investigation by contracting personnel. In some cases it may be necessary to reopen negotiations with bidders in order to establish a proper pricing pattern."

15. During the period November 1 to November 15, 1946, after the memorandum described in the preceding finding had been received, negotiations were reopened with 15 of the overcoat contractors, including plaintiff. These negotiations were supervised by Major Voiers, then Director of Procurement in the New York Office, and were carried on verbally either in his office or in that of the contracting officer, who left the New York Office about November 11, 1946, on another assignment.

Col. Christie, who was in charge of the Manufacturing Division of the Philadelphia Quartermaster Depot, had conferred with the overcoat contractors in October 1946, and was thoroughly familiar with the specifications involved in the production of the overcoats. He advised the procurement officials in New York that, in his opinion, $19 per coat was a fair price for the type of overcoat required. The contracting officer and Major Voiers then agreed that the negotiations with the contractors should be so conducted that $19 per unit would be the maximum price for any contractor. As a result of the negotiations, agreements were made to reduce the awarded unit prices to amounts not exceeding $19 per unit with 15 contractors. One of the contractors agreed to reduce his unit price from $22.75 to $21 per coat.

During the period of these negotiations, the demand for civilian wear continued strong, and clothing manufacturers were operating at full capacity. The contracting officer and Major Voiers both considered that the prices obtained as a result of the negotiations were fair and reasonable at that time.

16. Early in November 1946, plaintiff received a telephone request to report to the contracting officer for a discussion of its contract, and Messrs. Oberman and Bell responded to the request. They were told that the contract price was too high, that the profits were excessive, and that they should agree to a reduction of the prices as awarded. During the discussion, the contracting officer and other procurement officials who participated had before them the price analysis which had been prepared by the Cost and Price Analysis Section. At the first meeting, plaintiff refused to make any reduction either in the contract price or the amount of profit included therein, but a few days later, plaintiff's officers were again called in by the contracting officer and agreed to reduce the operating profit of Rainier, Inc. from $1.73 to $1.63 per unit. Mr. Bell proposed that the reduction be applied to the estimate of labor costs, but the contracting officer insisted that it should apply to the profit specified in plaintiff's bid. The agreement was set forth in Modification "C" of the contract. It was dated November 27, 1946, and provided that the unit price was reduced from $19.09 to $18.99 and that the Revision of Price article of the contract was to remain in full force, unaffected by the modification.

17. On November 15, 1946, Major Voiers submitted to the Quartermaster General a report on the progress of the negotiations with the contractors, and with respect to plaintiff's contract, stated as follows:

"Refigured all elements of cost and substantiated computation. Re-

duced prime contractor's profit in the amount of .10."

By the time plaintiff's contract was modified as described above, a thorough study had been made by the New York Office of each item of estimated cost in the bid, including officers' salaries and profit.

18. The bid form did not contain any provision for indicating the relationship between plaintiff and its subcontractor, and plaintiff submitted no information to the contracting officer to the effect that both concerns were under the same management and ownership.

Plaintiff's bid had stated that the coats were to be manufactured at the plant of the Smith Co. in Brooklyn, and when this plant was inspected by a representative of the contracting officer in June 1946, the Smith Co. was engaged in the manufacture of civilian clothes. As has been shown, Messrs. Oberman and Bell were present at the time of the inspection, and the inspector was informed that Mr. Bell would be the production manager for the contract involved here. On July 15, 1946, plaintiff wrote the contracting officer regarding the inspection that had been made of the plant in Brooklyn and referred to it as "our factory." Again on July 25, 1946, plaintiff wrote the contracting officer, stating that arrangements had been made to use the facilities of the Newell Clothing Co. in Vineland, New Jersey, and that the equipment there was "in addition to our own facilities on file."

Standard procedure in effect in the Supply Division of the Quartermaster Corps at the time the contract was entered into provided for an investigation by the contracting officer to determine the relationship or affiliation between the prime contractor and all subcontractors named in bids.

In December 1946, Major Voiers, the successor contracting officer, obtained reports from Dun & Bradstreet, Inc., which disclosed the relationship between plaintiff and the Smith Co., but there is no explanation in the record as to why the original contracting officer had not called for and obtained these reports prior to the early part of November, when the contract was renegotiated, especially since the Quartermaster General had criticized the New York Office for its failure to submit a proper analysis of the bids and had on October 16, 1946, pointed out that in passing on the amount of profit to be allowed, consideration should be given by the contracting officer to the character and extent of subcontracting. However, the reports were not obtained until December 1946, and at the time he carried on negotiations with plaintiff in November 1946, Lt. Bearce did not know of the relationship between plaintiff and the Smith Co.

In his analysis of the several bids submitted to the Quartermaster General on October 5, 1946, Major Voiers stated, among other things, that there was no indication of the financial arrangement between plaintiff and its subcontractor. At that time, however, he knew of the probability of an affiliation between plaintiff and the Smith Co., but he did not obtain definite information that both companies were under the same ownership and management until he saw the Dun & Bradstreet reports. After receiving the reports, he notified Messrs. Oberman and Bell of the information he had obtained. They made no attempt at concealment but discussed the affiliation openly, stating that the facts with respect to the management and ownership of the two companies were matters of public record.

The facts outlined above were sufficient to put the contracting officer and Major Voiers on notice by October 29, 1946, that there was a strong probability of an affiliation between plaintiff and its subcontractor. If the contracting officer had inquired of plaintiff regarding the affiliation or had followed the established procedure, he would have been fully informed about the common ownership and management of the two companies prior to the early part of November 1946, when he called in plaintiff's representatives for the purpose of negotiating a reduction in the contract price.

19. By letter of May 19, 1947, Major Voiers notified plaintiff that almost 30 percent of the overcoats had been delivered and called attention to a provision in the price revision article which required the contractor to submit cost data within five days after delivery of 30 percent of the contract quantity.

Plaintiff completed delivery of 30 percent of the total contract quantity on May 21, 1947, and on June 10, 1947, it submitted audit reports for the period of performance to May 23, 1947, covering deliveries of about 35 percent of the overcoats. The reports showed that plaintiff's unit costs, exclusive of profit, amounted to $16.23 and that profit was applied to the unit costs in the same percentages as included in the renegotiated contract price of $18.99 per unit, thereby making a total cost of $21.33 per unit. In its letter of transmittal, plaintiff stated that the increased costs shown in the report were due to starting load expenses and certain changes in specifications but that conditions generally were the same as at the time the contract was awarded. Plaintiff therefore proposed that the unit price remain at $18.99 for the balance of the contract.

Because it failed to apply certain reductions allocable to work in process and also omitted an accrued payroll for the sewing department, plaintiff's audit report did not reflect a correct statement of its unit cost. Had the report been adjusted for the errors referred to, such unit cost, exclusive of profit, would have amounted to approximately $15.85 per unit.

20. By memorandum of June 5, 1947, the contracting officer requested advice from the Chief of the Legal Branch as to the following:

"What legal grounds exist for the Contracting Officer to insist (when negotiations fail) on a reduced dollar profit where the percentage remains approximately the same in reference to actual operating costs?"

On June 16, 1947, the Chief of the Legal Branch replied in part as follows:

"The amount of profit may be a subject of negotiation since there is nothing in the contract article which provides that the original estimated profit is binding either upon the Government or the contractor. In negotiating a revised price, all factors should be considered including contractor's efficiency record in keeping costs down, a comparison of his costs with those of other contractors, a comparison of profit with that of other contractors and any other factors which are believed to have a bearing on the price to be negotiated. For example, the contractor's failure to maintain a proper accounting system may very well influence the contracting officer's decision as to the reliability and reasonableness of the costs and profit claimed by the contractor. However, the profit as set forth in the original cost breakdown is definitely evidence that the parties agreed, at least for the purpose of an original estimate, that such profit was not unreasonable. It would be difficult to defend the arbitrary disallowance of a profit set forth in the original cost estimate, and upon which the award was originally approved, without adequate justification for such action."

21. On June 12, 1947, plaintiff's cost data were submitted to the Cost and Price Analysis Section, which recommended that a field audit be made of both the prime and subcontractor's records.

The audit was not ordered at that time. Instead, the Price Adjustment Review Board, composed of various officials in the New York Office, met to consider the matter of negotiating a revision of the profit items in the contract price. No decision on that question was made, but the Board voted that the field audit be made and that the Cost and Price Analysis Section send a special letter of instructions to the Army Audit Agency, outlining the information desired.

On July 28, 1947, the Price Adjustment Advisory Group met in the New York

Office to consider what amount should be withheld from payments on plaintiff's delivery, pending the completion of the field audit. This group was organized in the New York Office to advise contracting officers, and Major Voiers was a member. One member stated that $5 should be withheld from the award price of $18.99, and on being consulted as to his wishes in the matter, the contracting officer stated:

"Would like to see something in the vicinity of $16.00. This fellow has delivered about 40,000 units. If we withheld $5.00 per unit it would mean the delivery of $200,000 worth of Coats with no payment whatever. I want to force their hand, but don't want to force it so much that it will cut their production."

Then it was suggested that the Government withhold the subcontractor's profit, amounting to $3.06 per coat, since this would provide a tangible basis for a finding of fact by the contracting officer. When this suggestion was made, the contracting officer stated that whatever action was taken, he was prepared to make a finding of fact if called upon to do so. A motion was then made and adopted to withhold the sum of $3.06 per unit from plaintiff and proceed with the field audit.

The request for the field audit was made on July 29, 1947, and the audit was commenced by the Army Audit Agency about August 5, 1947.

22. On June 27, 1947, the contracting officer wrote plaintiff, stating that sufficient data would not be available within 30 days after plaintiff's cost data were submitted to permit the parties to agree on a revised price, pursuant to the price revision article. He requested an extension of 30 days and plaintiff consented. Thereafter, by letters of July 15, 1947, August 18, 1947, and September 18, 1947, the contracting officer made similar requests for extensions of the 30-day negotiation period. Plaintiff assented to each request, thereby extending the negotiation period to October 18, 1947.

23. On July 29, 1947, the contracting officer wrote plaintiff, stating that,

effective immediately, the sum of $3.06 per unit would be withheld from funds due plaintiff as a temporary expedient to protect the Government, pending the results of the Government's field audit.

Plaintiff protested this action by letter of August 6, 1947, stating that the contract was not in dispute and that plaintiff was unable to understand the contracting officer's attitude in his dealings with plaintiff. Major Voiers replied on August 8, 1947, to the effect that the withholding of funds was not a reflection on plaintiff's performance of the contract, that negotiations for revision of price would be conducted upon completion of the field audit, and that promptly thereafter an adjustment of all funds withheld would be made.

About August 12, 1947, plaintiff's officers carried their protest to the Office of the Quartermaster General, and on the following day Major Voiers conferred with Army officials in Washington, D. C., who advised him that the withholding of funds was untimely and improper. It was suggested that in order to protect the Government's interests, plaintiff should submit a bond to remain in force until the price revision negotiations were completed.

Plaintiff's officers agreed to furnish a bond of $50,000, and Major Voiers then released approximately $100,000 of the funds that had been withheld. He retained $50,000 pending the receipt of a bond form approved by the War Department. The approved form of bond was never received, and the $50,000 was never released.

Up to the time the above-described actions were taken, no negotiations had been conducted with plaintiff pursuant to the terms of the price revision article. However, the contracting officer had on several occasions verbally requested plaintiff to reduce the amount of profit included in the award price. At one time plaintiff offered a reduction of 25 cents in its profit, but the contracting officer stated that was not sufficient, and the parties reached no agreement on the matter.

24. On August 12, 1947, the contracting officer wrote plaintiff requesting that it submit a new cost breakdown pursuant to paragraphs (b) and (c) of the price revision article. The effective date of the new breakdown was to be August 21, 1947, but at plaintiff's request the date was extended to August 29, 1947, to correspond with plaintiff's monthly closing date.

On September 29, 1947, plaintiff sent the required cost data covering the production of 60,520 overcoats. The unit cost amounted to $15.7192, exclusive of profit. To this, was added $3.2889 as operating profit for the Smith Co. and $1,-7848 for Rainier, Inc., or a total proposed unit price of $20.7929. However, in its letter accompanying the cost data plaintiff proposed that the unit price remain at $18.99 for the balance of the contract.

25. The Army Audit Agency submitted its report on September 19, 1947, stating that its audit covered an examination of plaintiff's books during the period from July 1, 1946 to May 23, 1947, and of the Smith Co.'s books from December 1, 1946 to May 23, 1947. As a result of a number of adjustments and some deletions from plaintiff's costs, the auditor found that the unit cost for the period audited amounted to $15.0492, exclusive of any profit. The report also stated that an examination had been made of the "latest costs prevailing in the period under review", and that the unit cost on that basis amounted to $13.-6893. No explanation was contained in the report as to how or on what basis the "latest costs" were computed, but at a hearing held by the Board of Contract Appeals on November 7, 1947, a witness for the Government stated that the Army auditor had determined the cost of producing the garments for the period from May 23, 1947 to July 1, 1947. To the extent that the report attempted to show costs after May 23, 1947, such costs must have been estimated because no inventory of work in process was available for the period from May 23, 1947 to July 31, 1947. The contractor's inventories of such work in process were made only for May 23, 1947, and August 29, 1947.

The Cost and Price Analysis Section reviewed the audit and decided that the difference between the unit cost reported by the Army Audit Agency for the period of performance to May 23, 1947 and the "latest costs" were starting load costs. These starting load costs were prorated to the total number of units to be delivered under the contract and a unit cost of $13.1612 was derived. This figure did not include officers' salaries or profits since these items were referred to the contracting officer for further consideration when the report was sent to him on October 14, 1947.

26. On October 16, 1947, the contracting officer telephoned plaintiff's president and demanded that he appear at once at the office of the contracting officer to negotiate a revised price. Plaintiff's president stated that he was unable to appear immediately, because one of plaintiff's officers was in the hospital and that he, Oberman, was needed at the factory. He suggested a meeting on Monday, October 20, 1947. Major Voiers insisted that Mr. Oberman appear immediately, and when Oberman refused, the contracting officer stated that he would then and there negotiate by telephone and proceeded to read off proposed unit prices in the various cost classifications for Oberman's approval.

When Mr. Oberman objected to this procedure, the contracting officer stated that he would issue a unilateral determination of a unit price in the amount of about $15 per unit and that the Government fiscal officer would be instructed to adjust payments accordingly.

Plaintiff then filed a telephone protest with the contracting officer's superiors in Washington and, as a result, the contracting officer consented to a meeting with plaintiff on October 20, 1947.

27. On October 20, 1947, Messrs. Oberman and Bell arrived with their accountant at the contracting officer's office for the purpose of negotiating a revised price. At the outset, Major Voiers in-

quired as to what reduction in profit plaintiff would consent to. Plaintiff's officers replied that they had come with their accountant to discuss all items of cost, and since they had previously submitted cost data on two occasions to the contracting officer, they requested that they be shown the Government's cost data, including the audit made by the Army Audit Agency. Major Voiers replied that the only thing he was interested in was a reduction in profit. Upon plaintiff's refusal to discuss a reduction in profit without regard to other costs involved, the contracting officer terminated the meeting after briefly referring to several classifications of costs.

The contracting officer declined to furnish plaintiff's representatives a copy of the Army Audit Agency report or any other cost data on which he relied, but he did mention the revised cost figures that had been submitted to him by the Cost and Price Analysis Section and stated that he would allow five percent additional for officers' salaries and a profit of approximately eight percent so that his determination would amount to approximately $15 per unit.

Aside from the several verbal requests that the contracting officer had previously made for a reduction of the profit in the award price, the conference of October 20th was the first and only one which was afforded by the contracting officer for negotiating a revision of price. The conference lasted about 20 minutes. The two sets of cost data which had previously been furnished by plaintiff were not used as a basis for negotiation. Plaintiff's representatives had no opportunity to determine what items claimed by them had been deleted, and they were given no information as to how the unit cost figure supplied by the Cost and Price Analysis Section was computed.

The evidence establishes that the contracting officer had made a determination of the unit price he intended to allow before the conference began, that he did not negotiate with plaintiff in accordance with the terms and provisions of the price revision article, and that he acted arbitrarily in making his determination.

28. On October 20, 1947, the contracting officer mailed plaintiff his written determination, stating that he had found the sum of $14.95 to be the fair and reasonable price for the 90,000 overcoats to be delivered by plaintiff under the terms of the contract.

29. By letter dated October 24, 1947, plaintiff appealed from the contracting officer's decision to the Secretary of War and charged that the contracting officer had not acted in good faith and had repeatedly breached the contract. These allegations were repeated in plaintiff's formal appeal of November 3, 1947, when plaintiff further alleged that the contracting officer had failed to follow the procedure required by the contract in negotiating or in determining a revised price.

On November 7, 1947, a hearing was held before the Army Board of Contract Appeals, which by decision of November 14, 1947, affirmed the contracting officer's determination. On the same day, the Secretary of War adopted the findings of fact and recommendations of the Board.

30. After plaintiff's appeal had been made, the matter of the profit allowances to the contractors manufacturing the Army overcoats under the same form of contract as that entered into with plaintiff became the subject of conferences between the New York Office and the Office of the Quartermaster General in Washington, D. C., on October 22, 1947. Five of the other overcoat contractors protested to Gen. Herman Feldman, Chief of the Supply Division in the office of the Quartermaster General, that Major Voiers, the contracting officer, had not negotiated with them in good faith, that he declined to budge from a maximum price of $15 per unit, that at a conference with the contractors held in May of 1947, he had made the categorical statement that he did not propose to alter the original dollar profit stated in the contractor's cost breakdown but that he had subsequently proposed drastic reductions in the profit figure.

As a result of the protest, the commanding officer and two other officials of the New York Office conferred with General Feldman in his office on November 10, 1947, at which time he attempted to clarify the problem of profit allowances under the contracts containing the price revision provisions. Upon his return to New York, the commanding officer of the New York Office issued a memorandum, which summarized the results of the conference and stated that it was furnished for the information and guidance of all personnel concerned. The memorandum stated in pertinent part as follows:

"3. General Feldman stated it was very definite War Department policy that in case of negotiated contract the dollar profit element was not to be disturbed as a result of subsequent price adjustments.

\*    \*    \*    \*    \*    \*

"6. General Feldman stated that in the case of Rainier he agreed that the profit was unconscionable but when the dollar profit was in the normal range it should not be disturbed. I stated it was my understanding that profit in this field should not exceed a maximum of 6% to 11% and it was my understanding that a few of the contracts provided for profit beyond that figure and in one case to something above 12%. Colonel Everett stated that this was not sufficiently above the maximum to warrant lowering. In any event, and notwithstanding the percentage of dollar profit, General Feldman stated that the policy of the War Department was inflexible and would apply in these overcoat contracts, except where profits were abnormal, as in the Rainier case.

\*    \*    \*    \*    \*    \*

"8. The officers of OQMG were adamant and it was reiterated that the War Department policy was as indicated above, and was to be observed by this office."

After receiving a copy of the memorandum from the commanding officer, Major Voiers asked confirmation of the policy with respect to profits in a memorandum dated November 12, 1947, which was addressed to the Director of Procurement in the New York Office, and stated in part as follows:

"1. Reference is made to all contracts containing Price Revision Articles. It is understood that the New Department of the Army policy is, that original dollar profit is to remain inviolable, and not subject to revisions.

Confirmation is requested.

\*    \*    \*    \*    \*    \*

"3. Particular attention is invited to the fact that the above Article states *prices*, and does not state costs, nor does it state *prices* other than profit. It has been the opinion of the undersigned and his assistants that this actually meant that all elements were subject to negotiations.

\*    \*    \*    \*    \*

"4. Findings of the Fact on numerous other contracts have been made by the undersigned, these Findings were based on a field audit; three (3) contracts that have been amicably settled on numerous other facts, admittedly the profit factor had been reduced in dollar value but still are liberal. All of these Findings are to be reviewed again with the express purpose of considering and re-instating the original dollar profit. Confirmation of this action is likewise requested."

Major Voiers' memorandum was forwarded to the commanding officer on November 14, 1947, by the Director of Procurement, who called attention to a report received by Major Voiers to the effect that the Army Board of Contract Appeals has made findings of fact in the Rainier case sustaining the unit price of $14.95 established by the contracting officer.

Colonel Grice, the commanding officer, in turn forwarded the memoranda which he had received from his staff, including the memorandum he had received

from Major Voiers, to General Feldman on November 15, 1947. The letter stated that prior to the conference with General Feldman on November 10, 1947, the New York Office had understood that the contractor's profits were subject to redetermination under the price revision clause based upon a reasonable rate and that in the light of the decision that had been made by the Army Board of Contract Appeals in the Rainier case, some clarification of the policy announced by General Feldman appeared to be desirable.

General Feldman replied by letter of November 18, 1947, which read as follows:

"Reference is made to your personal letter of 15 November 1947 requesting clarification of certain aspects of the Department of the Army's pricing policy under the II B clause.

"The pricing policy may be restated as follows:

"The dollar profit contemplated at the time of the original negotiation of contract will neither be increased nor decreased except:

"a. When clearly unconscionable

"b. When specification or other changes on the part of the Government cause changes in cost beyond the control of the contractor.

"This policy is not to be interpreted as to preclude any discussion or negotiation of the profit factor when the contractor is willing, nor to prevent a negotiated price which includes a lowered profit factor to which the contractor agrees. No contracting officer can reopen such a case for tthe purpose of increasing the agreed price thereby giving away the Government's funds without due consideration.

"To warrant a deviation from the pricing policy because of unconscionable profit, the profit must be clearly unconscionable and not merely in excess of that which is considered normal for the particular type of contract.

"The aforementioned policy is not new but is merely a restatement and clarification which has been passed on to the Quartermaster Corps by General Staff, U. S. A., the office responsible for the II B clause, and therefore, best able to interpret its intent.

"It must be constantly borne in mind that any policy must be applied to the particular set of facts at hand. Innumerable variations in application will arise as the facts vary. Policy is not a formula. Judgment must be exercised in the application of policy. When a formula only is to be applied any junior clerk is competent, but the Quartermaster Corps expects judgment and sound judgment to be displayed by its officers and key civilians."

31. Multigraph copies of General Feldman's memorandum were prepared and distributed to all officials and personnel concerned with procurement in the New York Office. After the memorandum was received by him, Major Voiers reviewed the price determinations he had made in five of the overcoat contracts and revised his findings by increasing the amount he had allowed each of the contractors for profit to the amount of the profit specified originally in each of the bids. No action was taken on plaintiff's case, which was then on appeal.

32. Plaintiff's motion for a rehearing was granted by the Army Board of Contract Appeals, and the rehearing was held January 30, 1948.

Prior to the hearing, plaintiff completed deliveries of overcoats in accordance with the contract delivery schedule and by December 31, 1947, had delivered a total of 90,050 overcoats.

After deliveries had been completed, plaintiff's accountant prepared a final audit report covering its entire cost of performance, and the report was received in evidence at the rehearing by the board. Plaintiff also submitted to the

board at the rehearing revised cost data for the initial period of the contract ending May 23, 1947. Plaintiff's final audit showed a unit cost of $15.0497, exclusive of profit for which plaintiff claimed $3.06 per unit for the Smith Co. and $1.63 per unit for Rainier, Inc.

In addition to the above-described audits, the Board had before it at the rehearing the reports of the Army Audit Agency and the Cost and Price Analysis Section.

Following the rehearing, the Board on June 14, 1948, issued a decision in which it recommended increasing the revised unit price to a total of $15.2324. Its recommendation was adopted and approved by the Secretary of the Army, and plaintiff has been paid a total of $1,573,-488.67, or at a unit price of $15.2324 for the 90,050 overcoats delivered under the contract.

In its opinion of June 14, 1948, the Board relied on the report made by the Army Audit Agency of the costs incurred by plaintiff up to the period ending May 23, 1947. The Board also based some of its determinations on plaintiff's final audit covering the entire period of performance.

33. Ten of the overcoat contractors appealed to the Army Board of Contract Appeals. A summary of the unit prices, as well as a statement of the manufacturing costs, exclusive of executive salaries and profits, allowed by the Board in the appeals heard by it, is set forth below. The cases of the first seven contractors listed in the table were heard by the Board prior to the publication of its second decision in plaintiff's case.

| Contractor | Units Delv'd | Original Awards | Voluntary Revisions | Established by the Board | |
|---|---|---|---|---|---|
| | | | | Manufacturing Costs | Price Fixed |
| Kalis | 29,200 | $22.75 | $21.00 | $13.659 | $15.842 |
| Cosmopolitan | 35,000 | 17.50 | ........... | 14.55 | 16.56 |
| Popular | 45,000 | 21.85 | 19.00 | 14.1817 | 15.9817 |
| Valor | 38,000 | 20.25 | 19.00 | 13.8108 | 15.8408 |
| Victory Sport | 50,000 | 21.95 | 19.00 | 13.7658 | 15.7658 |
| Expert | 50,000 | 21.95 | 19.00 | 13.8911 | 15.7658 |
| Victory App'l | 20,000 | 19.46 | 19.00 | 13.86 | 15.62 |
| Rainier | 95,050 | 19.09 | 18.99 | 12.9724 | 15.2324 |
| Universal | 55,000 | 19.00 | 18.875 | .............. | 15.71946 |
| Arlene Coats | 125,000 | 19.25 | 19.00 | 13.44 | 15.29 |

The following table is derived from the preceding table and shows the amounts included in the Board's unit price allowances for executive salaries and profits and the percentage of such executive salaries and profits to the total unit price:

| Contractor | Executive Salaries and Profit Included in the Fixed Price | |
|---|---|---|
| | Amounts | Percentage |
| Kalis | $2.183 | 16.0 |
| Cosmopolitan | 2.01 | 13.8 |
| Popular | 1.80 | 12.7 |
| Valor | 2.03 | 14.7 |
| Victory Sport | 2.00 | 14.5 |
| Expert | 1.8747 | 13.5 |
| Victory Apparel | 1.76 | 12.7 |
| Rainier | 2.26 | 17.4 |
| Arlene | 1.85 | 13.8 |

34. At the time of the hearings, the rules of the Army Board of Contract Appeals provided that when an appeal was taken from the decision of the contracting officer, it was his duty to forward to the chief of the service concerned a true copy of his findings of fact and decision, the original appeal to him, a transcript of any evidence heard by him, and all other pertinent papers in the case. The rules further provided that when the chief of the service received the file it was his duty to exercise care to see that the record was complete and to promptly forward the complete file to the board. The review file with respect to plaintiff's appeal was prepared by Major Voiers and his assistants. The file did not contain and the

Board did not have before it the memoranda and letters exchanged between the New York Office and the Office of the Quartermaster General with respect to the analysis and investigation of the items contained in plaintiff's bid, a report of the renegotiation resulting in a reduction in the profit item, Major Voiers' report as to the substantiation of all elements of cost, or any of the letters or documents relating to the contracting officer's withholding of funds on the coats that had been delivered by plaintiff. The review file sent to the Board did not contain any of the letters or memoranda exchanged between officials in the New York Office and by General Feldman with respect to the policy of the War Department on the revision of the dollar profit specified in the contractor's bid, because plaintiff's appeal was made before such memoranda were written. However, despite the fact that the rehearing on plaintiff's appeal was held more than two months after General Feldman's letter of November 18, 1947, was written, neither the memorandum nor any of the papers relating thereto were submitted to or considered by the Board.

35. In its decision of November 7, 1947, the Board stated in part as follows:

"Although appellant charges lack of good faith during negotiation by the contracting officer, not a scintilla of evidence has been produced to support such charges."

At the hearing before the Board on October 24, 1947, plaintiff's officers repeated the charges contained in their notice of appeal to the effect that the contracting officer had breached the contract and had acted with malice and bad faith in determining a revised price. When plaintiff's officers undertook to testify about these matters, the Board displayed a lack of interest in the charges and took the position that the only material question before it was whether the allowances made by the contracting officer were fair and reasonable. The members of the Board further stated that the way to prove bad faith was to establish

that plaintiff's figures were correct and that those made by the contracting officer were erroneous. Nevertheless, plaintiff's officers presented sworn testimony in some detail regarding the manner in which the contracting officer had conducted the negotiations for a revision of price. Major Voiers testified at both of the hearings, and although he stated that he felt that he had negotiated in good faith in accordance with the provisions of the price revision article, he did not deny any of the specific facts presented in the above-described evidence by plaintiff.

The above-quoted statement from the Board's first decision was repeated in substantially the same language in its decision of June 14, 1948. Neither statement is supported by substantial evidence.

36. Since General Feldman's memorandum was written in response to Major Voiers' request and since the contracting officer had amended his decision in five contracts in compliance with the memorandum, its subject matter should have been fresh in his mind when he appeared at the second hearing on plaintiff's appeal. Yet when he was questioned at the hearings about War Department policy with respect to the treatment of profit he made no reference to the memorandum. When asked specifically whether he had received any instructions from anyone in the Quartermaster General's Department as to the treatment of profit, he stated, in effect, that it was the general policy to leave the profit as stipulated in the contract price, except where the contracting officers considered the profit to be "out of line." When questioned further as to the existence of any written instructions on the subject, he stated that his commanding officer had attended a conference in Washington and had sent him a memorandum which he did not have available at the hearing. Upon being asked whether there were any other written instructions relating to the treatment of the profit item and particularly whether he recalled receiving anything from

General Feldman, he answered that he could not testify as to that.

37. In its final decision, the Board deleted some items of expense claimed by plaintiff and reduced the amounts claimed on other items of cost. Plaintiff has excepted to these disallowances, and the facts pertaining thereto are set forth in the succeeding findings.

38. The Board deleted from plaintiff's final costs an item of $21,000 paid for officers' salaries by the Smith Co. and accounted for under the classification "indirect factory expense-labor". As will be shown in a subsequent finding, the Board allowed a total of five percent of other expenses for all salaries paid to plaintiff's officers.

On April 27, 1946, 48 days before the invitation to bid on the contract was received, the board of directors of Rainier, Inc., and the Smith Co. fixed the salaries of the four officers of Rainier, Inc., at $13,000 each per year and of the Smith Co. at $13,000 each per year. After work on the contract began, the Smith Co. allocated three-eighths of the officers' salaries paid by it to "Indirect Factory Expense-Labor" and the remaining five-eights to "General and Administrative Expenses." Accordingly, when plaintiff submitted its cost data for the period ending May 23, 1947, the Smith Co. charged $9,000 of officers' salaries paid as factory overhead and $15,000 of such officers' salaries as general and administrative expenses. The same ratios were used by plaintiff to the end of production when $21,000 was charged to factory overhead and $35,000 to general and administrative expenses on the books of the Smith Co.

Joseph Bell and Abraham Smith, two of the officers of the Smith Co., were engaged in factory production and technical work as distinguished from administration and general supervision. Mr. Bell was the production manager in the factory. He was experienced in the manufacture of clothing and had managed production of a similar overcoat under another Government contract. He planned the layout of the factory, devised and converted some of the machinery and equipment used in making the coats, and directed the production operations in a factory employing approximately 300 people. Abraham Smith was also skilled in the manufacture of clothing, and worked in the factory under the direction of Mr. Bell. Mr. Smith handled all problems that arose in connection with the labor employed in the factory and settled disputes that arose between the foremen and other employees. When necessary, he also instructed the foremen on the performance of specific factory operations.

Neither the contracting officer nor the accountants who made the Army Audit Agency report questioned the Smith Co.'s allocation of a portion of the officers' salaries to factory overhead. It was a proper factory expense and was reasonable in amount. The Board's decision in deleting the item was arbitrary and is not supported by any evidence in the record. The deduction amounted to $.2209 per unit of production.

39. In the Army Agency Audit, $2,726.80 expended by the Smith Co. for holiday pay was reclassified and transferred from the account for direct labor to indirect factory expense. The Board deleted the item entirely on the erroneous impression that it represented a duplicate charge. The amount, which represented a unit cost of $.0717 ($2,726.80÷38030.68 units per Army audit), should have been added to indirect factory expense.

40. The Board deleted from the expenses claimed by plaintiff the sum of $17,450, which represented rental which plaintiff became liable to pay for a period after December 31, 1947, when the contract was completed. Plaintiff began work on the manufacture of the overcoats under its contract in the latter part of November 1947, and having determined that its factory on Flushing Avenue was inadequate to meet the delivery schedule as provided under the contract, it leased additional space on the first floor of a building at 1166 Manhattan Avenue, Brooklyn. The lease was en-

tered into November 15, 1946, and extended for a period of three years, beginning December 1, 1946. Plaintiff also leased additional space at 732 DeKalb Avenue in Brooklyn, New York, for a term beginning January 15, 1947, and ending 18 months thereafter.

When the additional space was leased, plaintiff's officials knew that it would not be required in plaintiff's civilian business. However, since space was scarce at that time, they believed that the additional space could be subleased when the contract involved here was completed. Plaintiff was unable to rent additional space for one year only, and after the contract had been completed, plaintiff was unable to sublease the property to others.

In the first of the two audits which plaintiff submitted to the contracting officer, plaintiff claimed rental paid for the additional factory space at the monthly rates for the periods covered, but in its final audit it included the amount of rental payable under the leases from January 1, 1948, until the expiration of such leases.

The Board's decision of June 30, 1948, with respect to this item, read in pertinent part as follows:

"The Board does not consider this cost as one which can be charged as a cost of production on this contract. The evidence before the Board does not support the appellant's contention that it was forced to begin operation of the contract before the time contemplated. There is no evidence before the Board that the contracting officer ordered this appellant to begin work early in December, rather than January.

\* \* \* \* \* \*

"There is nothing in the record which indicates that the Government was advised in any manner of the length of the leases which the appellant took on these properties, although the appellant did advise the contracting officer that it was going to use them and the Gov-

ernment inspected and approved the suitability of the space. We do not see how this rental paid for occupancy after the contract was completed should properly be charged as a cost of performance under the instant contract."

The Board's decision with respect to the rental claimed was not arbitrary and is supported by substantial evidence.

41. As a part of the indirect factory expenses of the Smith Co., plaintiff claimed the sum of $11,417.75 for assets amortized at 50 percent. The Board held that the assets involved in this account should be depreciated at the normal rate applicable to other machinery and equipment owned by plaintiff and allowed 10 percent of the cost of the machinery or $2,283.55, instead of the amount claimed by plaintiff.

Plaintiff claims that the expense was incurred for converting machinery and equipment to provide labor-saving devices. However, the greater weight of the evidence shows that the charge was actually a mixed account, which consisted of the cost of machinery and equipment purchased for the performance of the contract, the cost of certain electrical fixtures and motors, costs involved in converting some machinery for use on the contract, and labor expense for installing the machinery and making changes in the plant for the production of the overcoats. The actual cost of converting the equipment for use on the contract would have been a proper charge against manufacturing expense. However, plaintiff mingled an unascertainable amount of such conversion costs with other costs that were not proper charges against manufacturing expense.

The Board held that it could not find that the machinery and equipment had a residual value of only 50 percent of its cost after one year's usage. It has not been established that its decision was arbitrary, or is not supported by substantial evidence.

42. Plaintiff's schedule of factory expense contained an account for rental of

machines in the amount of $12,976.79. The Board deleted this item entirely on the erroneous impression that it represented rental paid by the Smith Co. to Rainier, Inc. for machines owned by it.

The Board's error was in part due to the fact that plaintiff's treasurer testified that the item represented rental paid to Rainier, Inc., by the Smith Co. When asked about the amount paid by Rainier, Inc., for the rental of machines, he stated that about 80 percent of the machinery used was owned by Rainier, Inc., and about 20 percent was rented from other concerns.

The only item deducted from the Smith Co.'s account for machine rent in the Army Audit Agency report was a service charge made by Rainier, Inc., in the sum of $849.58. The balance of the charge was approved. This fact was confirmed by a representative of the Army Audit Agency who testified at the same hearing where plaintiff's treasurer appeared as a witness.

The evidence clearly establishes that plaintiff incurred costs of $12,976.79 for rental paid to other concerns for the use of machines employed on the contract work. The unit cost of machine rental for the total number of overcoats manufactured and delivered was $.1365 per unit.

43. Plaintiff included in its cost of performance the sum of $8,926.08 for entertainment expenses. In deleting this item from general and administrative expenses, the Board in its opinion stated:

"* * * The appellant has $8,926.08 (or about $750 a month) charged as entertainment. Evidence on this cost indicates that most of this money was spent for the entertainment of union officials and delegates in order to assure harmonious relations between the union and the appellant. The Board cannot approve such costs as proper for the Government to pay. It is excessive in amount and wholly unnecessary, if not indeed improper. * * *".

The evidence shows that most of the amount included as an expense for entertainment was spent for meals, drinks, and other entertainment for union officials and delegates. Plaintiff claims that part of the expenditure was for Christmas parties for employees. However, plaintiff maintained an account entitled "Employees Welfare", in which expenses incurred for the welfare of employees were entered.

War and Navy Department regulations in effect at the time the contract was performed and entitled "Explanation of Principles for Determination of Costs under Government Contracts" (defendant's exhibit 22) provided in effect that entertainment expenses were not admissible for the purpose of computing the cost of performing a Government contract. The Board's disallowance of such expense was not capricious or arbitrary.

44. The Board allowed an item of $183 for advertising by the Smith Co. as a proper charge against the contract but deleted advertising costs claimed by Rainier, Inc., in the amount of $1,924.79 with the statement:

"No satisfactory explanation has been offered why Rainier, Inc. which according to the record, had only one employee other than the officers, should find it necessary to expend $1,924.79 for advertising."

The evidence before the Board showed that in addition to newspaper advertising for labor, plaintiff carried institutional advertising in magazines, such as the West Point Magazine. Plaintiff also advertised in the Quartermaster Journal, a trade magazine published for clothing manufacturers engaged in doing business with the Quartermaster Corps. There is no indication in the record that the advertising was placed for the purpose of obtaining commercial sales of civilian goods to be manufactured by plaintiff, and the report of the Army Audit Agency did not exclude any part of the amount charged to advertising.

War and Navy Department regulations, in effect at the time and referred

to in the preceding finding, provided as follows with respect to advertising:

"51. As a general rule advertising is an inadmissible item of cost, on the reasoning that advertising is not required in order to do business with the Government. However, certain kinds of advertising of an industrial or institutional character, placed in trade or technical journals, not primarily with the object of selling particular products but essentially for the purpose of offering financial support to such trade or technical journals, because they are of value for the dissemination of trade and technical information for the industry are not really an advertising expense to effect sales so much as an operating expense incurred as a matter of policy for the benefit of the business and the industry. Here again the contractor's accounts should provide for suitable analysis to distinguish between possibly admissible and inadmissible costs."

The Board's deletion of the amount expended for advertising is contrary to the regulations and is not supported by substantial evidence. The erroneous deduction for advertising amounts to $.0203 per unit of production.

45. As part of general and administrative expenses, plaintiff included travel expenses in the sum of $2,135.30 for Rainier, Inc., and $1,070.51 for the Smith Co. The Board allowed a total of $1,500 for travel expenses for Rainier, Inc., and excluded the remainder of $1,705.81. Its opinion with respect to such travel expenses read as follows:

"A cost element of $3,205.81 for traveling is included in the General and Administrative expense. Again proof in the record does not justify such a large expenditure. No doubt some traveling was necessary but it does not appear to the Board that such an expenditure as large as the one set up in this account is reasonable under the circumstances. The office of the contracting officer was in New York, as was the appellant's manufacturing plant. The Quartermaster Depot was located in Philadelphia, which is only a short distance from New York. In the opinion of the Board $1,500 should adequately pay for all the necessary travel which the appellant would have had to do in the performance of this contract. We therefore feel that the remainder, $1,705.81, should be deleted from this cost element."

In their testimony before the Board, plaintiff's representatives stated that they had traveled to Washington, D. C., in August of 1947 in an attempt to obtain a release of funds withheld by the contracting officer. The cost of that trip would not account for the total amount claimed, and plaintiff has failed to establish that the amount spent for travel, in excess of the amount allowed by the Board, was proper, reasonable or necessary in the performance of the contract. The Board's action on the account for travel expenses was not arbitrary or capricious.

46. Plaintiff's general and administrative expenditures under the contract included accounts for professional services totaling $12,046.59, of which $5,471.63 was spent by Rainier, Inc., and $6,574.96 was spent by the Smith Co. The Board allowed $5,000 of such expenses and deleted the remainder. Its opinion with respect thereto stated:

"We find charged to General and Administrative expense the sum of $12,046.59, paid to attorneys and accountants for professional services and this expense has been nearly equally divided between Rainier, Inc. and its subcontractor, A & L Smith Garment Company. Again we have a cost element for which there is little proof as to its necessity or reasonableness. Because of this lack of proof the Board must use its own judgment as to what it considers a reasonable charge for professional services. We are of the opinion that under the circumstanc-

es herein, $5,000 for professional services is a liberal charge to the contract. In making this determination the Board has considered that the production under the overcoat contract ran into several difficulties common to all the manufacturers. First was uncertainty as to the interpretation of the contract resulting in conferences with the contracting officer and his superiors in New York and Washington; next came trade meetings to settle labor pirating; and then negotiations on the question of revision of price. Under these circumstances, on each of which there has been voluminous testimony, the Board concludes that allowances for professional services should be substantially more liberal than would be requisite in normal routine manufacture. * * *"

During the period of performance, an attorney and an accountant were regularly employed and each was paid for his services at the rate of $5,000 per year. The attorney, a brother of Abraham Smith (secretary of Rainier, Inc., and president of the Smith Co.), was paid a retainer of $200 per month by each of the companies to perform any legal services that were required in connection with the operation of the businesses. His services were required and used in connection with the leasing of space, contracts entered into with the labor unions, questions that arose under the labor laws, and legal problems involving employees. Plaintiff's accountant was a certified public accountant, who had been practicing for approximately 15 years. He supervised the bookkeeping of both companies, prepared the various cost statements and audit reports submitted to the contracting officer and to the Board, and performed other services as needed.

In the Army Audit Agency report, which was before the Board, the only adjustment made in plaintiff's accounts for professional services was a deduction of $146.33, and the contractor concurred in the deduction.

The record before the Board and the Court. establishes that the services of the attorney and the accountant were necessary in the performance of the work under the contract and that the amounts paid were not excessive or unreasonable. The amount disallowed by the Board amounts to $.0741 per unit. Its decision with respect thereto is not supported by substantial evidence.

47. As part of the cost of performance by the Smith Co., plaintiff claimed $6,877.12, which represented 50 percent of the cost of certain improvements and installations at plaintiff's main plant on Flushing Avenue in Brooklyn. Plaintiff charged one-half the cost of the improvements to the contract because they were attached to realty held under a two-year lease that terminated on March 15, 1948. The Army auditor, who examined the books, also amortized the cost of such improvements to the leased property at 50 percent of the cost thereof per annum.

The Board held that such a large amortization was not proper and allowed depreciation equivalent to 10 percent of the cost of the improvements. The remainder of $5,501.70 was disallowed.

The evidence establishes that the improvements on the leased property were not plaintiff's assets and could not be depreciated by it. The improvements consisted of a ventilating system, electrical wiring, and other equipment that was not removable and became a part of the realty. Under standard accounting principles, it is proper to amortize the cost of such improvements over the life of the lease. The amount claimed is similar in all respects to a charge of $6,975.60, which was allowed by the Board and represented the amortized cost of improvements attached to the leased property located at DeKalb and Manhattan Avenues in Brooklyn. The Board's decision with respect to the amount claimed was erroneous and is not supported by substantial evidence. The amount deleted represents a cost of $.0579 per unit of production.

48. Rainier, Inc., eliminated its account for interest paid to banks in its

final audit, but the Smith Co. had an account for bank charges in the amount of $408.98, which the Board considered as an interest charge and deleted as an expense which was not authorized by Government procurement regulations. The expenditure was a service charge of the kind generally made by banks for handling checking accounts and is based on the ratio of the number of checks issued to the depositor's balance.

Since the expense was incurred as a result of inadequate financing, it is in the same category as interest paid to banks and is not allowable under Government procurement regulations as a cost which may be included in the negotiation of prices under a new War Department contract. The Board's deletion of this item was not arbitrary or capricious.

49. In their accounts for general and administrative expenses, Rainier, Inc., included $67,500 and the Smith Co. $35,000 for executive salaries during the period the contract was performed.

As shown by their income tax returns, the four officers who owned the two companies did not draw the full amount of the salary ($13,000 a year from each corporation), which had been authorized. In 1946 each of the four officers received a salary of $1,000 from Rainier, Inc., and $5,000 from the Smith Co. In 1947, they each received $9,750 from Rainier, Inc., and $13,250 from the Smith Co. Rainier, Inc., charged the salaries of two of its officers for the period from about July 1, 1946 to December 31, 1947, and the salaries of the other two officers from about December 1, 1946 to December 31, 1947, to the contract. The Smith Co. charged to the contract a total of $56,000 for officers' salaries paid from about December 13, 1946 to December 31, 1947. Of this amount, $21,000 was allocated to factory overhead labor as shown in finding 38.

Based on a comparison of similar charges made by other contractors, the contracting officer allowed five percent of other production expenses for executive salaries as a part of general and administrative expenses.

As has been shown, the Board set aside the contracting officer's decision, which approved an allocation of $21,000 of such salaries to factory overhead. The Board treated all officers' salaries as general and administrative expenses and held as follows with respect thereto:

"The propriety of this salaries item of $123,500 is not sustained by the evidence in the record. The two companies were new ventures for these four men; Rainier, Inc. was only organized in February 1946, and the A & L Smith Garment Company was organized in March 1946. It cannot be said that the salary scale set up in these companies was so well established prior to the time this Government contract was entered into that it became a fixed salary scale. The identity of the salaries and the shifting of official title between the two close corporations confirm the view that for the purpose of fixing fair compensation to these men, as must be done in arriving at a fair price, the whole remuneration should be considered, as though the individuals were partners, as they seem to have been in all but form. Testimony of past earnings and offers from competitors have been disregarded in arriving at proper salary compensation, because no matter how valuable these men are or were, the amount chargeable to this contract must bear a reasonable relation to the total amount involved. In other words, the full-time services of such high priced men have not been shown to be necessary for performance. As was held in the first recommendation, and fully confirmed by comparison with salaries paid by other contractors, which information was not available at the first hearing, a charge of about 5% of cost for executive salaries, adjusted for variations in the profit figure, when payable to the same interests, is ample

compensation for supervisory duties. It should be noted that the amount allowed for officers' salaries is in addition to $47,820 already allowed for production men, foremen, and assistant foremen, who are also supervisory labor in character."

The officers of the two companies were experienced clothing manufacturers and devoted their full time to the contract. However, as already shown, two of them were primarily engaged in factory production and technical work, whereas the activities of the other two officers were confined to general administration and supervision.

The contract provided that in the negotiations for price revision the types of data to be employed included comparative prices and comparative costs. A fair and reasonable allowance for executive salaries for general supervision and administration of the contract work is five percent of other performance costs.

Aside from its deletion of the $21,000 which plaintiff had properly allocated to factory overhead, it has not been established by the evidence that the Board's decision with respect to officers' salaries was arbitrary or capricious. At five percent of other production costs, the unit cost of executive salaries amounts to $.6777.

50. The operating profit of $3.06 for the Smith Co. and $1.73 for Rainier, Inc., as stated in plaintiff's bid was reduced by subsequent negotiation to a total profit of $4.69 per unit.

In his determination, the contracting officer allowed a total profit of $1.13 per unit. The Army Board of Contract Appeals in its second decision allowed a total profit of $1.60 per unit. However, when the Board made its decision, it did not have before it a correct or complete statement of the Army's pricing policy with respect to the dollar profit contemplated by the contractor at the time of the original negotiation of a contract containing the price revision clause. Neither General Feldman's letter of November 18, 1947, which set forth the policy, nor the letters and memoranda which were exchanged between the New York Office and General Feldman in respect thereto, were presented to or considered by the Board when its decision was made. The testimony of the contracting officer before the Board regarding the policy was vague and misleading.

The policy stated in General Feldman's memorandum was established by the General Staff of the Army, the policy-making arm of the Secretary of the Army. The policy was mandatory and was as binding on the members of the Board as on other employees of the War Department.

Since Rainier, Inc., and the Smith Co. were under the same ownership and management and since the activities of both companies were intermingled in the performance of the contract, it is reasonable to treat both as one operating entity for the purpose of arriving at a reasonable profit for the performance of the contract. From a consideration of all the evidence, it is found that a fair and reasonable profit for the manufacture of the overcoats involved in this action is $3.06 per unit.

On June 4, 1947, the Price Adjustment Review Board adopted a specific policy as to the amount of profit to be allowed in Government contracts containing the price revision article, where the subcontracting operations were performed by an affiliated company. The statement of policy, which was approved and sent to all branch chiefs in the New York Office, read as follows:

"* * * That in determining a reasonable profit on subcontracted operations, where such operations are performed by a subsidiary or affiliated company, *the profit rate normally earned* by the subsidiary or affiliate on such operations shall be considered reasonable for purposes of price revision in all cases that come before the Board; and, that in determining the end price to the prime contractor, there shall not be included any element of *additional profit* on such subcontracted operations. [Italics supplied.]

"3. In connection with the above and pertinent to the point under discussion, reference is made to a publication issued by the United States Government Printing Office in April 1942 under the title, "Explanation of Principles for Determination of Costs Under Government Contracts." Paragraph 53 on page 14 of the above publication states that 'The following general principles should be observed in connection with purchases or transfers of materials, parts, supplies, or services entering into the products furnished under a Government contract' and subsection (b) of that paragraph reads as follows:

"Purchase from subsidiary, affiliated or controlled companies or by such companies from parent, affiliated or controlling companies should not be made to result in an increased ultimate cost to the Government. The net cost of such purchases should not be greater than it would have been had they been made from others. It is not the purpose to discourage such intercompany purchases at proper prices when this is in the interest of the efficient and expeditious performance of the contract. It is the purpose to prevent undue price increases through such inter-company relations and in such cases the fixed fee or the contract price should duly take all the circumstances into account."

If plaintiff's appeal had not been pending before the Army Board of Contract Appeals at the time the contracting officer received General Feldman's memorandum, the contracting officer would have been obligated by the policy established by the War Department to allow plaintiff a profit of $3.06 per unit (the original dollar profit specified in plaintiff's bid for its subcontractor), and the approval of that amount of profit would have been in accordance with the action the contracting officer took when he restored the dollar profit originally specified in bids of the five contractors referred to in finding 31.

The bid for the Smith Co. was prepared by Mr. Bell, who provided for a profit of 10 percent of the total estimated cost of making the overcoat, including the value of materials furnished by the Government. He estimated the value of Government materials at $17 to $18 per garment as compared with $17.69, which the contracting officer calculated as the unit cost of Government materials. The estimate was in accordance with the normal pricing practices of the clothing industry, and the amount of profit included therein was considered reasonable by both contracting officers after a careful study and an analysis of all elements of cost involved. Aside from the cost of the materials, the contractor would have incurred some additional costs in financing the purchase of materials furnished by the Government. However, interest on borrowed money was deleted from plaintiff's final statement of the cost of performance, and the other expenses involved in buying material would have had little effect on the total cost of manufacturing the coats. The expenses of receiving, recording, storing and handling the Government-furnished material were substantially the same as they would have been had plaintiff bought the material, and the spoilage of Army goods while in plaintiff's possession was charged to it.

51. In addition to the items of cost discussed in the foregoing findings, the Board made several other adjustments in and deductions from the costs claimed by plaintiff. However, except as otherwise stated in preceding findings, the decision of the Board with respect to the revised unit price is supported by substantial evidence.

52. Plaintiff manufactured 95,050 overcoats, of which 90,050 were delivered under its contract, and 5,000 were manufactured by it as a subcontractor for another contractor.

The revised unit price herein found is $17.2915. The difference between the

amount plaintiff has been paid for the 90,050 coats involved in this action at the revised price found by the Board and the amount that would be due at the revised price herein found is the sum of $185,421.95.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States one hundred eighty-five thousand four hundred twenty-one dollars and ninety-five cents ($185,421.95).